IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,913






KENISHA ERONDA BERRY, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM CAUSE NO. 89,642 IN THE 252
ND DISTRICT COURT


JEFFERSON COUNTY





 Johnson, J., delivered the opinion of the Court in which Price, Womack,
Holcomb, and Cochran, JJ., joined. Hervey, J., filed a dissenting opinion in which
Keller, P.J., Meyers and Keasler, JJ., joined.


O P I N I O N



 Appellant was convicted in February 2004, of capital murder. Tex. Penal Code § 19.03(a). 
Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure
Article 37.071, §§ 2(b), (e), the trial judge sentenced appellant to death. Art. 37.071, § 2(g). (1) Direct
appeal to this Court is automatic. Art. 37.071, § 2(h). We have reviewed appellant's nine points of
error. We affirm the trial court's judgment, but reform the sentence to life imprisonment.

STATEMENT OF FACTS

 Appellant was indicted for the murder of an individual under six years of age. The evidence
at trial showed that in the early morning hours of November 29, 1998, Roy Black discovered the
victim's body while he and his wife, Ima, were looking for aluminum cans in a dumpster at an
apartment complex in Beaumont, Texas. Roy found the deceased male infant inside a trash bag with
duct tape over his mouth. His arms were secured across his chest with duct tape and there was fecal
matter inside the trash bag. Ima alerted the police and named the infant "Baby Hope."

 The case remained unsolved until the summer of 2003, when Debbie Beavers of the Jefferson
County Sheriff's Department was investigating another case involving appellant. During the course
of the investigation, appellant took Beavers to the dumpster where Baby Hope had been found. 
Beavers brought this to the attention of Beaumont police officer John Boles, who had appellant's
fingerprints compared to those found on the duct tape and trash bag. A latent palm print on the trash
bag matched appellant's right palm. A latent fingerprint on a piece of duct tape matched appellant's
left index finger. DNA testing of the victim's blood and appellant's oral swabs indicated a 99.98%
probability that appellant was the mother of the victim.

 On June 27, 2003, Child Protective Services (CPS) worker Tracy Rideaux met with
appellant, who was in jail on another charge. At that time, appellant had an infant daughter named
Paris, who was in the care of CPS. She also had a nine-year-old daughter named Jasmine, a seven-year-old daughter named Keerstan, and a three-year-old son named Joskin. Rideaux testified that
appellant's infant daughter was fathered by a man named Leonard Carrier and her three older
children were fathered by a man named Joskin Love. At the first jail meeting, Rideaux and appellant
discussed the removal of Jasmine, Keerstan, and Joskin, and the potential for a family placement. 
Rideaux met with appellant in jail again on July 10, 2003, after appellant had been charged with
capital murder in the death of her son Malachi, known to authorities as Baby Hope. Rideaux asked
appellant if her family knew anything about Malachi or other hidden pregnancies, because their
knowledge would affect the placement of appellant's children. Appellant told Rideaux that "she
knew how to hide a pregnancy" and her weight fluctuated a lot. She stated that "her family had
absolutely nothing to do with Baby Hope or what was going on." She revealed that she gave birth
to Malachi at home in her apartment, that it was an "easy delivery," and that he was "fine" when he
was born. She went to the store and purchased a bottle and some formula after his birth. Her other
children were with a relative at the time of his birth, and when the children returned home, she
explained that "she was keeping a friend's baby." She did not give Rideaux any details about the
duct tape other than acknowledging that she had duct tape "lying around the house." She did not
confess that she killed Malachi , but stated that she borrowed her grandmother's car, placed the
infant, "which was already inside the trash bag," in the trunk, and transported him to a dumpster
without anyone's knowledge. She stated that "the baby was not kicking or moving" when she put
him in the dumpster.

 Appellant testified at trial that she did not kill her baby. She knew that she was pregnant in
1998, but she did not know how far along she was in her pregnancy. The father of the baby was a
man named Nicholas Beard. She did not tell her family or anyone else about her pregnancy. She
gave birth at home by herself and named the infant Malachi. He appeared to be healthy when he was
born, and she fed him milk from a bottle. His nose started running the next day, and she went to the
store that morning to buy milk. When she returned from the store, he was still asleep on the bed in
her bedroom. She lay on the couch to watch television and later checked on him because she was
concerned that he had not yet awakened. When she went into the bedroom, he was "limp" and was
not moving or breathing. She realized that he was dead , but did not call for help because she was
"scared" and did not know "if it was against the law to have a baby at home." She put duct tape over
his arms because they were stiff and sticking out and she "wanted them in front of him." She put
duct tape over his mouth because it bothered her that his mouth was open. She left her apartment
with Malachi in a bag and later placed him in a dumpster.

 The prosecutor questioned appellant on cross-examination regarding her infant daughter
Paris. Appellant acknowledged that she hid her pregnancy with Paris, but avoided answering the
prosecutor's questions about whether she had abandoned Paris on the side of a road.

 Forensic pathologist Tommy Brown had performed the autopsy on Baby Hope and estimated
that he was two to five days old. Duct tape had been used to cover his mouth and to constrain his
arms around his abdomen, and he had been placed inside a plastic trash bag. His stomach contained
a "milk-like product," which indicated that he had been fed before death, and there was fecal matter
inside the plastic trash bag. He had "petechiae of the pleural surfaces of the lung," which was
consistent with oxygen deprivation. The combination of being duct taped and covered with a plastic
trash bag was also consistent with oxygen deprivation. Brown observed no indications of an
infection or sudden-infant-death syndrome. He determined that the infant "died from asphyxia due
to smothering," and he ruled the death a homicide. Brown opined that the infant was still alive when
he was placed in the plastic trash bag, and "as the baby died, then there was a large release of fecal
material from the rectum." The lividity on the anterior and posterior sides of the body led him to
conclude that the infant was lying on his stomach when he died and that after he was discovered he
was turned over and placed on his back for a short period of time.

 Defense expert Stephen Pustilnik, a forensic pathologist, testified that he reviewed Brown's
autopsy report and the photographs and microscopic slides that were taken at the autopsy. He
observed "multiple areas of meconium (2) aspiration" in the microscopic slides of the victim's lungs,
and he criticized Brown for failing to include an assessment of the microscopic slides in his autopsy
report. He believed that the infant released meconium from his bowels while experiencing fetal
distress prior to birth, which later caused "a significant pneumonia enough to explain this child being
very sick and sick enough to die." He also observed petechiae on the surface of the infant's lungs,
but stated this was a "nonspecific finding" that "should never be used as proof of anything." He
testified that the duct tape on the infant's mouth would not necessarily cause asphyxia because most
babies are "obliga[te] nose breathers." However, he acknowledged that the plastic trash bag could
have caused asphyxia. He did not think that the fecal matter inside the plastic trash bag was
indicative of the time of death because defecation could have occurred either at or after the time of
death, nor did he think that the infant was struggling in the bag when the fecal matter was released
from his rectum because the feces was confined to his buttocks, lower back, and "the back of the foot
that was resting in it because the knee was flexed up and the foot was in the feces." He disputed that
the lividity on the body necessarily indicated that the infant died on its stomach because "[t]here are
always exceptions to this rule." Pustilnik could not specifically conclude what caused the death of
the infant. He acknowledged the possibility of homicide and asphyxia, but testified that the "child
could have died naturally prior to being placed in the bag with the tape on it." He had "two good
guesses" as to why the infant died: "One is natural, one is homicide." He testified that "it's just as
likely that this child died of a natural cause as it is that it died of a homicide."

 Defense expert Carl Hunt, a medical doctor specializing in pediatrics and neonatology,
testified that he reviewed the autopsy report and accompanying photographs. He testified that the
duct tape on the victim's mouth "would not be suffocating to this infant" because "young infants
prefer to breathe through their noses." He believed that the fecal material inside the plastic trash bag
was insignificant because "the release of fecal material could have occurred at any time." He agreed
that petechiae on the infant's lungs could have developed due to oxygen deprivation, but stated that
petechiae are "not proof of any particular mode of death" and are "very common in autopsies of
young infants who die in unexplained situations." Hunt "could not reach a conclusion as to how or
why this baby died" until he spoke to Pustilnik, who informed him that he had discovered the
presence of meconium in the microscopic slides of the infant's lungs. After Pustilnik told him this
, Hunt concluded that "this infant died of natural causes related to birth asphyxia and meconium
aspiration syndrome, in other words, lung failure."

 The state recalled Brown after the testimony of Pustilnik and Hunt. Brown disagreed with
Pustilnik's findings of pneumonia or infection. He testified that he specifically looked at the
victim's lungs during the autopsy.

Whenever I looked at the lungs, the alveolar spaces were open. There were a few
squamous cells, which comes from the amniotic fluid within the alveolar spaces. 
There was meconium that was described earlier. It has a yellow brown pigment
effect. So, I did not realize there was any of that within the lungs. A pneumonia-
you have to have neutrophils, which are white blue cells for bacterial infection or you
have lymphocytes, which indicates a viral infection. The baby had neither of those. 
I cannot call this a pneumonia.


Brown continued to believe that the cause of death was "asphyxia due to smothering and a
homicide."

SUFFICIENCY OF THE EVIDENCE AT GUILT / INNOCENCE

 In point of error one, appellant alleges that the evidence is factually insufficient to support
her conviction for capital murder. Evidence may be factually insufficient if: "1) it is so weak as to
be clearly wrong and manifestly unjust or 2) the adverse finding is against the great weight and
preponderance of the available evidence." Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000). In Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006), we recently reiterated
that the evidence, though legally sufficient, is factually insufficient if it is so weak that the jury's
verdict seems clearly wrong and manifestly unjust, or whether, considering conflicting evidence, the
jury's verdict, though legally sufficient, is nevertheless against the great weight and preponderance
of the evidence. Such a factual sufficiency review requires the reviewing court to consider all of the
evidence. Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006). A clearly wrong and
unjust verdict occurs where the jury's finding is manifestly unjust, shocks the conscience, or clearly
demonstrates bias. Sells v. State, 121 S.W.3d 748, 754 (Tex. Crim. App. 2003); Santellan v. State,
939 S.W.2d 155, 164 (Tex. Crim. App. 1997).

 Appellant argues that "the overwhelming evidence presented at the trial indicated that the
child died of natural causes rather than a homicide," pointing to the testimony of defense experts
Pustilnik and Hart. Pustilnik, however, could not pinpoint the cause of the victim's death. He
acknowledged the possibility of homicide and asphyxia, but testified that the infant could have died
from pneumonia following meconium aspiration. He ultimately concluded that "it's just as likely
that this child died of a natural cause as it is that it died of a homicide." Hunt initially could not
determine the cause of death based on his own review of the autopsy report and photographs. He
was able to reach a conclusion only after talking to Pustilnik and hearing his description of the
microscopic slides.

 Appellant attacks Brown's conclusion, based on the presence of fecal matter, that the infant
was alive when placed inside the plastic trash bag. Pustilnik and Hunt disagreed with Brown's
conclusion, but acknowledged the possibility that defecation could have occurred at the time of
death. Appellant argues that the infant could not have been smothered by the duct tape on his mouth
because Pustilnik and Hunt testified that most infants are obligate nose breathers. Pustilnik,
however, acknowledged that the plastic trash bag could have caused asphyxia.

 Brown's conclusion that the infant did not have pneumonia was supported by other evidence
at trial. On voir dire examination by the state, Pustilnik testified that "a child with this much
pneumonia" could be "irritable," "hard to take care of," and "whiny." However, appellant told
Rideaux that the infant was "fine" when he was born. She also testified at trial that he appeared to
be healthy at birth, and she described no symptoms of illness other than a runny nose.

 The experts' disagreement regarding the cause of death does not make the evidence
insufficient in this case. The evidence supporting the verdict was not so weak as to be clearly wrong
and manifestly unjust, nor was the adverse finding against the great weight and preponderance of the
available evidence See Marshall, 210 S.W.3d at 625-26; Watson, 210 S.W.3d at 414-15. Point of
error one is overruled.

TESTIMONY OF CPS WORKER

 In point of error two, appellant argues that the trial court erroneously admitted the testimony
of CPS worker Tracy Rideaux regarding statements appellant made to her in jail. Appellant
complains that she received none of her statutory or constitutionally required warnings before
making her oral statements to Rideaux. Appellant contends that Rideaux was a state agent and was
thus required to warn her in compliance with Miranda v. Arizona, 384 U.S. 436 (1966), and Article
38.22. (3)

 The procedural safeguards of Miranda apply to custodial interrogation by law enforcement
officers or their agents. Wilkerson v. State, 173 S.W.3d 521, 527 (Tex. Crim. App. 2005). State
employment does not, by itself, make a person an agent of the state for the purpose of defining
"custodial interrogation." Id. at 528. Different types of state employees serve different roles. Id. 
It is law enforcement's job to ferret out crime, investigate its commission, arrest the perpetrator, and
gather evidence for a possible prosecution. Id. CPS workers have a different duty: to protect the
welfare and safety of children in the community. Id. Police officers and CPS workers generally run
on separate, parallel paths. Id. at 529.

While police are collecting information for an arrest and criminal prosecution, CPS
workers are investigating to find safe housing and protection for abused or neglected
children. When a state-agency employee is working on a path parallel to, yet separate
from, the police, Miranda warnings are not required. 

 On the other hand, if the once-parallel paths of CPS and the police converge,
and police and state agent are investigating a criminal offense in tandem, Miranda
warnings and compliance with article 38.22 may be necessary.


Id. Courts must examine the entire record to determine if the paths of CPS and the police are parallel
or if they have converged in a particular case. Id. at 530. Central to this evaluation are the actions
and perceptions of the police, the CPS worker, and the defendant herself. Id. The essential inquiry
is: "Was this custodial interview conducted (explicitly or implicitly) on behalf of the police for the
primary purpose of gathering evidence or statements to be used in a later criminal proceeding against
the interviewee?" Id. at 531.

 Rideaux testified that she was a CPS foster-care supervisor in Jefferson County. When
Rideaux first met with appellant in jail, appellant had an infant daughter who was in the care of CPS
and three other children who needed "placement." When the prosecutor asked Rideaux what
appellant said to her during their meeting, appellant objected to any "custodial statements made
under questioning by the state" and requested a hearing on the admissibility of the statements. 
Outside the presence of the jury, Rideaux testified that she met with appellant in jail on June 27,
2003, and July 10, 2003. She denied questioning appellant at the direction of law enforcement. She
testified that her purpose for interviewing appellant was "[t]o discuss the removal reasons, as well
as to obtain information regarding the children's health, social and educational history, also to obtain
social history from her regarding her family and to discuss possible options for relative placement." 
She needed to know if appellant's family had any knowledge of what she had done because there
were family members who were willing to care for the children. She testified that "[i]n foster care
we have limited contact as far as with law enforcement." She told appellant that she was not there
to act on behalf of law enforcement. She did not give appellant Miranda warnings because she "was
not there doing an investigation." After hearing her testimony, the trial court made findings on the
record. 

I find that the statements made by [appellant were] made freely and voluntarily. I
also find that while [appellant] was in custody that these statements were not
pursuant to a custodial interrogation, as it was not in connection with a criminal
investigation. Therefore, I'm going to allow the testimony.


 Rideaux then testified before the jury that appellant had been charged with the capital murder
of Malachi by the time Rideaux met with her in jail on July 10, 2003. Rideaux told appellant that
the CPS placement decision would be affected if her family had any knowledge about Malachi or
other hidden pregnancies. Appellant said that "she knew how to hide a pregnancy" and that her
family had no knowledge of Malachi . She explained that she gave birth to him at home in her
apartment, that it was an "easy delivery," that he was "fine" when he was born, that she had duct tape
"lying around the house," and that she transported him in a trash bag to a dumpster without anyone's
knowledge.

 Rideaux was not an agent of law enforcement who was required to comply with Miranda and
Article 38.22. Rideaux's purpose was to find a placement for appellant's children. Since a family
placement was being considered, Rideaux needed to determine if appellant's relatives knew about
the death of Malachi or the abandonment of appellant's infant daughter. Rideaux clearly denied
having a law-enforcement purpose or acting at the direction of the police. There is nothing in the
record to indicate that the police used Rideaux to gather evidence to be used against appellant in this
capital-murder prosecution. Appellant did not testify regarding her perceptions of her encounters
with Rideaux, but Rideaux testified that she told appellant that she was not there to act on behalf of
law enforcement. The trial court did not abuse its discretion in admitting Rideaux's testimony
regarding appellant's statements. Point of error two is overruled.

EXTRANEOUS OFFENSES

 In points of error three and four, appellant complains about the admission of extraneous
offenses at the guilt phase of the trial. She argues that the admission of evidence of her "hidden
pregnancies" and the abandonment of Paris violated Texas Rule of Evidence 404(b). In point of
error five, appellant asserts that the admission of this evidence violated Texas Rule of Evidence 403
because "[t]he prejudicial effect of the subject extraneous acts outweighed any probative value."

 Rideaux first testified about appellant's hidden pregnancies when the prosecutor questioned
her about her meeting with appellant in jail on July 10, 2003:

Q. What did you tell her was the concern that your agency had?


A. Regarding the removal?


Q. Of the older three children, yes.


A. Our concerns were that we had the pending capital murder case regarding
Baby Hope. At that point in time, she . . . had given birth to several children. 
Her mother only had knowledge of one of those births. We didn't know what
information or what part, if any, that the family had regarding Baby Hope.


Q. And what would that - - if the family knew about Baby Hope or other
pregnancies that were hidden, would that affect your decision regarding
placement?


A. Yes, it would.


Q. Were there other pregnancies that were hidden?


A. Yes.


Q. Did you discuss that with Ms. Berry?


 [DEFENSE COUNSEL]: Your Honor, I have to object to that. It's referring
to extraneous matters not admissible in the trial of this cause.


 THE COURT: Overruled.


Q. Did you discuss that with [Appellant]?


A. Yes, I did.


Q. And did she tell you whether or not she hid any of her other pregnancies?


A. She stated she knew how to hide a pregnancy.


 Rule 33.1 of the Texas Rules of Appellate Procedure provides that an objection must be
timely and sufficiently specific to make the trial court aware of the complaint, unless the specific
grounds were apparent from the context. Appellant's objection to "extraneous matters," although
not as precise as it could be, was sufficient under the circumstances to apprise the trial court that she
was objecting under Texas Rule of Evidence 404(b). Montgomery v. State, 810 S.W.2d 372, 387
(Tex. Crim. App. 1990). However, the Rule 404(b) objection was not timely because it was made
after Rideaux had already testified that there were other hidden pregnancies. Appellant also failed
to preserve her Rule 403 claim because she did not further object on that basis. Id. at 388.

 The prosecutor later questioned appellant about the abandonment of her infant daughter:

Q. Who's your fifth child?


A. Paris.


Q. Paris. Who's Paris' father?


A. Leonard Carrier.


Q. What did you do with Paris?


 [DEFENSE COUNSEL]: Your Honor, I have to object to any reference to any
extraneous matter that's not appropriate for this jury.


 THE COURT: Overruled.


 [PROSECUTOR]: I submit 404(b), Your Honor, to show intent.


Q. What did you do with Paris?


A. (No response)


 [DEFENSE COUNSEL]: And Your Honor, we would also object under
404(b) that the prejudicial effect outweighs any probative value to that particular
thing.


 THE COURT: That's overruled.


 Following this exchange, appellant refused to give any testimony about her abandonment of
Paris, despite the prosecutor's repeated questions and the trial court's instructions to answer them. 
Even though defense counsel's objection was timely and sufficiently specific to preserve the alleged
Rule 404(b) and Rule 403 errors, appellant gave no testimony on this particular topic.

 After appellant testified, the prosecutor re-called Rideaux to ask her about appellant's
abandonment of Paris:

Q. Ms. Rideaux, did you talk to [appellant] regarding the incident concerning her
child, Paris Berry?


A. Yes.


 [DEFENSE COUNSEL]: Your Honor, could we, just for the purposes of the
record, have a running objection to any testimony concerning extraneous offenses?


 THE COURT: Yes, sir.


 [DEFENSE COUNSEL]: I assume the ruling of the Court is the same?


 THE COURT: Overruled.


 In this instance, appellant made an objection that was timely and sufficiently specific to
preserve her Rule 404(b) challenge to Rideaux's subsequent testimony. After the trial court
overruled appellant's objection, Rideaux testified that appellant told her "she had placed [Paris] out
on Hillebrandt Road." Appellant had previously stated that someone helped her, but then changed
her story, telling Rideaux that she acted alone. Rideaux testified that appellant said that "she knew
how to hide a pregnancy and that her weight fluctuated a lot," and she appeared to be proud of that
fact.

 While evidence of other crimes, wrongs or acts is not admissible "to prove the character of
a person in order to show action in conformity therewith," it may be admissible for other purposes,
such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of
mistake or accident. Tex. R. Evid. 404(b). This list is illustrative, not exhaustive. Johnston v. State,
145 S.W.3d 215, 219 (Tex. Crim. App. 2004). For example, extraneous-offense evidence may be
admissible when a defendant raises an affirmative defense or a defensive issue that negates one of
the elements of the crime. Id.

 The state argues that the subsequent hidden pregnancy and abandonment of Paris showed that
appellant "was keeping the children fathered by Joskin Love, and discarding the children fathered
by other men," thus demonstrating her motive and her intent to kill Malachi . Appellant's intent was
a disputed issue in this case. Appellant's defensive theory was that the baby died of natural causes. 
She denied killing her child, and the defense and state experts disagreed about the cause of death. 
Appellant testified that Jasmine, Keerstan, and Joskin were fathered by Joskin Love. She
acknowledged that Malachi and Paris were fathered by two different men, and she "kept to [herself]"
with regard to those pregnancies. Rideaux then confirmed that appellant "knew how to hide a
pregnancy" and abandoned Paris on the side of a road shortly after birth. Rideaux's testimony was
admissible to prove appellant's motive and her intent to kill Malachi . The trial court's decision to
admit this evidence was within the zone of reasonable disagreement and was not an abuse of
discretion. Santellan, 939 S.W.2d at 169. Points of error three, four, and five are overruled.

JURY ARGUMENT

 In point of error six, appellant claims that the prosecutor misstated the evidence in his closing
argument at the guilt phase of the trial. Appellant specifically complains about the following portion
of the prosecutor's argument.

 [PROSECUTOR]: Did you hear [appellant] when she testified? She used the
words "that baby." She didn't use Malachi. She didn't tell you, "I loved Malachi." 
She didn't say any of that.


 [DEFENSE COUNSEL]: Your Honor, I do have to object that it misstates
the testimony because I think she referred to it as "my baby" throughout.


 THE COURT: Overruled. The jury will be instructed to recall the testimony.


 Appellant contends that she never referred to her child as "that baby" when she testified at
trial. The state concedes on appeal that "[t]he prosecutor did misstate how Appellant had testified,"
but argues that the prosecutor "was simply mistaken" and that any error was harmless.

 There are three factors to consider when assessing the impact of the harm arising from jury
argument error: (1) the severity of the misconduct (the magnitude of the prejudicial effect of the
prosecutor's remarks); (2) the measures adopted to cure the misconduct (the efficacy of any
cautionary instruction by the judge); and, (3) the certainty of conviction absent the misconduct (the
strength of the evidence supporting the conviction). Mosley v. State, 983 S.W.2d 249, 259 (Tex.
Crim. App. 1998); Threadgill v. State, 146 S.W.3d 654, 666-67 (Tex. Crim. App. 2004).

 The prosecutor's statement does not amount to severe misconduct. He did not repeat the
statement after appellant objected to it. The trial court overruled appellant's objection, but instructed
the jury "to recall the testimony." Rideaux specifically testified at trial that appellant referred to the
victim as "that baby" during their interviews. The prosecutor's argument focused on other, more
damning, evidence, such as appellant covering the victim with duct tape and a plastic bag, disposing
of him in a dumpster, and later abandoning another newborn on the side of a road. The state
concedes this error, but the error did not affect appellant's substantial rights, and we must therefore
disregard it. Tex. R. App. P. 44.2(b). Point of error six is overruled.

 In point of error seven, appellant again complains of improper jury argument at the guilt
phase. Appellant asserts that the prosecutor improperly struck at appellant over the shoulders of
defense counsel when he argued that defense counsel told an expert witness that "we're looking for
a defense." The prosecutor made the statement at issue during his closing argument.

 [PROSECUTOR]: . . . The defense controlled how much information got to
both of those experts. You heard [the prosecutor] go, "What did you examine? Did
you ever examine the victim, or did you ever look at the pictures? Did you ever
contact any of the witnesses? Did you contact C.P.S.? Did you talk to the family? 
Did you talk to the defendant?" Things that Dr. Pustilnik said that you should do. 
. . . He violated his own protocol. He told you what his agenda was from the
beginning.


 [Pustilnik] goes, "My first impression was homicide." But then the defense
tells him, "Well, we're looking for a defense. We're looking-and the defendant's
told us that-"


 [DEFENSE COUNSEL]: Your Honor, I have to object. It's outside the
record, and we never told any expert witness we're looking for a defense. It's outside
the record and simply not true, Your Honor.


 THE COURT: Overruled.


 [PROSECUTOR]: You can ask for Dr. Pustilnik's testimony. Dr. Pustilnik
said, in talking to [defense counsel], the defendant told them that the baby had died
before she put him in the bag. So, they were looking for a defense. He knew what
he needed to do before he came to one of his conclusions. And what did he do? Did
he contact, did he talk to Dr. Brown? The answer's "no." Did he contact any of the
people involved? No. Did he talk to the defendant? No. Did he talk to the family? 
And God bless, they've had to go through this.


 Permissible jury argument generally falls into one of four areas: (1) summation of the
evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing
counsel; or (4) a plea for law enforcement. Cannady v. State, 11 S.W.3d 205, 213 (Tex. Crim. App.
2000). We have consistently held that argument that strikes at a defendant over the shoulders of
defense counsel is improper. Wilson v. State, 7 S.W.3d 136, 147 (Tex. Crim. App. 1999); Dinkins
v. State, 894 S.W.2d 330, 357 (Tex. Crim. App. 1995). Even assuming that appellant's objection
was sufficient to preserve her claim on appeal, her claim fails because the prosecutor's argument was
a reasonable deduction from the evidence.

 Pustilnik initially told the prosecutor on cross-examination that his opinion about the cause
of death was based on his review of the autopsy, not on what defense counsel told him. When
defense counsel later questioned him on re-direct examination, the following exchange occurred:

Q. Now, the first time you and I met, do you remember what you told me about
the cause of death in this case?


A. Oh, yes I do.


Q. What did you tell me?


A. I said it looks like a homicide to me.


 * * *


Q. But you wanted to see what?


A. I wanted to see the autopsy slides, I wanted to see the autopsy photographs,
I wanted to see the rest of the case.


Q. And why did you want to see that?


A. Because you told me that the child had-the statement-can I say that-that the
theory was that the child was dead prior to being put in the bag. And
therefore, since that was the theory, it would have been my job, if this were
my case, to prove or disprove that the child could have died prior to being put
in that bag. So, I wanted to see everything that was done to look for a natural
disease that either proved natural disease was there or proved natural disease
was not there.


The prosecutor revisited this matter again on re-cross examination:

Q. Dr. Pustilnik, you said that the defense counsel contacted you and they
wanted to show that the child was already dead when it was placed in the
bag? Is that what you said?


A. No, they said that one of the explanations offered by the defendant was that
the child was already dead when it was placed in the bag, yes.


 The prosecutor was directly referring to Pustilnik's testimony when he made the statement
at issue during closing argument. It is a reasonable deduction from Pustilnik's testimony as a whole
that defense counsel told Pustilnik that at least one defensive theory was "that the child was dead
prior to being put in the bag" and that Pustilnik looked at the autopsy with this potential alternative
in mind. The prosecutor's statement, although aggressive, fell within the bounds of permissible jury
argument and did not strike at appellant over the shoulders of defense counsel. Point of error seven
is overruled.

SUFFICIENCY OF THE EVIDENCE AT PUNISHMENT

 In point of error eight, appellant argues that the evidence is legally insufficient to support the
jury's affirmative finding on the future-dangerousness special issue. We view the evidence in the
light most favorable to the jury's finding and determine whether any rational trier of fact could have
found beyond a reasonable doubt that there is a probability that appellant would commit criminal
acts of violence that would constitute a continuing threat to society. Jackson v. Virginia, 443 U.S.
307 (1979). If, given all of the evidence, a rational jury would have necessarily entertained a
reasonable doubt as to the probability of appellant's dangerousness in the future, we must reform
the trial court's judgment to reflect a sentence of life imprisonment. Holberg v. State, 38 S.W.3d
137, 139 (Tex. Crim. App. 2000); Article 44.251(a).

 The state presented evidence at punishment detailing appellant's abandonment of her infant
daughter Paris nearly five years after the death of Malachi. Andrew Durham testified that he heard
a baby crying as he was walking along Hillebrandt Road in Jefferson County between 6:30 a.m. and
7:00 a.m. on June 6, 2003. He found Paris lying on her back in a ditch approximately fifteen feet
from the road. She was naked and had fire ants all over her body. Durham alerted his wife, who was
a nurse, and she took Paris to the hospital. Paris had extensive ant bites and her eyes were swollen
shut. She needed a blood transfusion and experienced seizures in the hospital. Tracy Rideaux
testified that CPS was appointed as Paris's managing conservator and that she was later placed in
foster care. Rideaux reported that Paris still has scars from the ant bites on her face, arms, and
stomach.

 Investigator Beavers testified appellant first told her that she wanted Joskin Love to take her
to the hospital, but he instead drove them out to Hillebrandt Road and placed Paris on the ground. 
When Beavers informed appellant that Love had an alibi, she admitted that Love was not involved. 
She said that she was sorry for what she had done, but she did not express remorse about the child. 
Beavers testified, "Her biggest concern when she was crying the first time I talked to her was that
she was worried about what everybody was going to think and what everybody would say and how
mad her momma was going to be at her for coming and talking to us."

 Rideaux testified that appellant's oldest two children, Jasmine and Keerstan, had been in
counseling since their mother had been jailed on capital-murder charges. Jasmine had been
diagnosed with post-traumatic-stress disorder. Rideaux testified that Jasmine had expressed fear and
"wondered why her mom had [done] this to Baby Hope and Paris and why she had not killed them."

 Defense counsel called appellant's cousin, aunt, and mother to testify on appellant's behalf
at punishment. They testified that appellant was a shy and respectful child and a loving and caring
mother to Jasmine, Keerstan, and Joskin. They testified that her behavior regarding Malachi and
Paris was totally out of character. Appellant's cousin reported that appellant had previously been
employed in a fast food restaurant, a prison, and a child-care facility. Appellant's aunt and cousin
acknowledged that appellant had hidden all but one of her pregnancies from her family. They
testified that appellant's children loved her, and that it would negatively impact them if she received
a death sentence.

 Defense counsel presented the testimony of Dr. Oney Fitzpatrick, a developmental
psychologist who had done a social study of appellant's background. He reported that she was a shy
and socially isolated child and was cooperative, yet unmotivated, at school. She was a "good
worker" when she was employed at the Texas Department of Corrections, but eventually had to leave
that job because of "absenteeism." Fitzpatrick thought that appellant appeared to be clinically
depressed, a condition that could cloud her judgment and affect her decision-making processes. 
Appellant expressed love for Jasmine, Keerstan, and Joskin and denied killing Malachi . She told
Fitzpatrick that when she first became pregnant she worried that she would disappoint her mother
and grandmother because she had failed to live up to their expectations. Fitzpatrick believed that
there were mitigating circumstances in that appellant "was under an extreme amount of pressure,"
and her "sociocultural background [did] not promote reaching out to others for assistance."

 Defense counsel also presented the testimony of psychiatrist Dr. Edward Gripon, who
testified that appellant had been diagnosed with clinical depression in jail and had been placed on
antidepressants. He suspected that appellant had been depressed for "quite some time," but had
never sought treatment. He testified that clinical depression could impair appellant's judgment and
decision-making processes. Appellant denied killing Malachi, but expressed remorse for what had
happened. She told Gripon that she had abandoned Paris because she could not care for her and
wanted to sever her relationship with Paris' father. Gripon thought that there was a low risk of future
dangerousness because the incidents involving Malachi and Paris were unique and that there was
only a remote possibility that appellant would become pregnant in prison. Given those
circumstances, he saw little likelihood of appellant being a danger to society in the future.

 Finally, the state called rebuttal witness Linda Ament, the former warden of a women's
prison who had been employed by the Texas Department of Criminal Justice (TDCJ) for twenty-three years. She testified that female prisoners had become pregnant after having sexual relations
with male prison guards or other staff. She acknowledged that "the only way prison staff would
know that somebody's pregnant is either that somebody tells them or they're able to see that that
person's pregnant." On cross-examination by defense counsel, Ament testified that she had
encountered over 3,000 female inmates in her years of employment at TDCJ. During that time, she
had been personally aware of two inmates who became pregnant and had heard about two to three
others. She acknowledged that there was an extremely low likelihood that a female inmate would
become pregnant while in prison and that it was a "possibility" rather than a "probability" that such
a situation would occur.

 Appellant argues that there was insufficient evidence of future dangerousness because she
had no prior criminal background, and the defense experts testified that she had a low risk of future
dangerousness. Appellant also relies on Ament's testimony that she knew about only five instances
of pregnancy in the 3,000 female inmates she had encountered in her twenty-three years at TDCJ. 
Appellant asserts that "[s]imple math establishes that the likelihood of appellant becoming pregnant
in prison . . . would be 5 out of 3,000, or .16%." Appellant argues that the defense experts
established she "had been a threat only to two of her own children, a threat which [would be]
virtually eliminated by a sentence of life imprisonment throughout her child-bearing years."

 At punishment, the state argued to the jury that the death penalty should be assessed.

You've heard about future danger and you heard Dr. Gripon, who was hired by the
defense and he said that she's not a future danger because the victim pool was low
because in prison she's not going to have access. Remember, we talked to you about
what society was. We talked about it for a long time. . . . Imaginary circle-what
does society mean to you folks? You-all agreed it was anyone around her. And we
all asked you, when you're asking yourself that question, you have to assume whether
she's a future danger sitting there as she sits today, if she was out among us, among
other children, is she a future danger. Everything Dr. Gripon said was based on one
premise, that she's locked up and that somebody, not her, somebody else, would
intervene to protect that child. Remember, he said that she'll be locked up. Well,
that assumes the system is locking her up. . . . That assumes that she's locked up.


I submit to you the way you answer this question is if she was out and she's among
her children or she has another child, do you think she's a future danger to that
child. . . . Some people are just evil. (Emphasis added.)


 The state's argument clearly asked the jury to assume that appellant would be living in the
free world. Our precedent states clearly that "society," as used in Art. 37.071, includes both prison
and the "free world," and the jury must consider dangerousness in that context. See, e.g., Muniz v.
State, 851 S.W.2d 238, 250 (Tex. Crim. App. 1993)(state required to prove that "appellant would,
more likely than not, commit violent criminal acts in the future so as to constitute a continuing threat
to society whether in or out of prison."); Jones v. State, 843 S.W.2d 487, 495 (Tex. Crim. App.
1992)("'society' includes not only free citizens but also inmates in the penitentiary."). The state's
argument, therefore, was a misstatement of the special issue (4) in that the argument told the jury that
the only society it should consider was the free world. The jury had just convicted appellant of
capital murder. The only two possible sentences for such a conviction are death and life in prison;
there is no probation for capital murder, no release to the free world in the near term. Appellant was,
without doubt, going to be "locked up," either on death row or in the general prison population for
a minimum of forty calendar years. The state's argument therefore both misstated the law and 
misdirected the attention of the jury away from a determination of whether she would be a
continuing danger in the actual circumstances in which she would be living (prison) and toward a
determination of her continuing dangerousness in circumstances in which she most assuredly would
not be (the free world). (5) 

 We hold that the state did not meet its burden of proving beyond a reasonable doubt that there
is a probability that appellant, if allowed to live, would commit criminal acts of violence in the future
so as to constitute a continuing threat, whether in or out of prison. Holberg, 38 S.W.3d at 138-9. 
Appellant murdered one child and abandoned another, but defense witnesses testified that these two
incidents were out of character and that she was a loving and caring mother to her other three
children. Appellant's expert witnesses opined that she was depressed and under extreme stress when
she killed Malachi and, five years later, abandoned Paris. She had no criminal record, and the state
presented no other evidence of violence in her past. All of her offenses involved a pregnancy, but
testimony from both defense and state witnesses showed that her potential for becoming pregnant
while incarcerated would be "extremely low." Further, appellant was in her twenties when she was
convicted of capital murder. If she received a life sentence and were paroled forty years later, she
would be in her sixties and likely beyond her childbearing years and thus could not repeat such an
offense. 

 We rarely reverse a judgment on a claim of insufficient evidence to support a finding that the
defendant will be a danger in the future, and we do not do so lightly. In this case, we understand the
jury's decision in response to the death of one infant and the abandonment of another, even if that
decision is not supported in law. (6) The state's evidence, which consisted of appellant's murder of
Malachi, her subsequent abandonment of Paris, her lack of remorse for these crimes, and the unlikely
possibility that she might become pregnant in prison, does not prove beyond a reasonable doubt that
there is a probability that she would commit criminal acts of violence that would constitute a
continuing threat to society. While the state quite certainly proved that appellant showed a pattern
of keeping the children sired by one man and discarding the children sired by other men, it did not
prove that any other stimulus led to a violent or dangerous act in any other context. It did not show
that she had harmed or attempted to harm any of her other children, an unrelated child, or any other
person. Further, the state's final argument exacerbated the heavy emotional impact of the offense
by inviting the jury to use an improper standard in its consideration of future dangerousness. 

 The evidence indicates that appellant has been dangerous only toward those of her own 
children whose existence she wanted to hide from her favored mate, that there is a very low
probability that, if sentenced to life in prison, she will have any more children, and that therefore it
is unlikely that she would be a danger in the future. Point of error eight is sustained.

Conclusion

 Because a rational jury would have necessarily entertained a reasonable doubt as to the
probability of appellant's future dangerousness, we affirm the judgment of conviction and reform
the trial court's judgment to reflect a sentence of imprisonment for life. Because this holding affects
only the death penalty and any other points of error relative to the jury's findings on the issue of
punishment, appellant's ninth point of error, in which she claims that "[t]he evidence was
insufficient to support the negative answer to the special issue regarding mitigating circumstances,"
is moot.

 The judgment, as reformed, is affirmed.


Delivered: May 23, 2007

Publish

1. Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure.
2. The meconium is the first fecal excretion of a newborn child.
3. Appellant also claims that the admission of Rideaux's testimony violated her rights under the Texas
Constitution. Because appellant does not provide separate authority or argument for her state constitutional claim,
we do not address it. Heitman v. State, 815 S.W.2d 681, 690-91 n.23 (Tex. Crim. App. 1991). 
4. Code Crim. Proc. Art. 37.071, §2 (b)(1): "whether there is a probability that the defendant would commit
criminal acts of violence that would constitute a continuing threat to society[.]"
5. Children who kill their parents cannot commit that offense again, but such persons may also be shown to
have violent tendencies toward persons other than their parents. If no such tendencies are shown, a rational jury
would be justified in finding a lack of future dangerousness. A middle-aged serial killer of children is not subject to
the "aging out" of that predilection, but remains dangerous to children regardless of time spent in prison or age at the
time of release. (There is also no mandatory minimum term and such persons are, at least in theory, eligible for
parole in fewer than forty calendar years.) That is not the case here. Appellant has been shown to pose a danger only
to her own children. She will, without doubt, reach menopause and be unable to bear more children before she has
served the minimum of forty calendar years and has passed the age of 60. 
6. The state repeatedly described appellant as evil, a powerful word. The jury may well have agreed with
that assessment, but "just evil" does not equate with "a probability that the defendant would commit criminal acts of
violence that would constitute a continuing threat to society." Robert Hanssen, an FBI agent, and Aldrich Ames, a
CIA counter-intelligence officer, both of whom spied for Russia, are likely considered "evil" by many persons, but
they have never been accused of committing criminal acts of violence.